RALSTON DRY–WALL COMPANY, INC., Plaintiff,

v.

UNITED STATES GYPSUM CO. and Robert J. Clark, Defendants.

Civ. A. No. 89–0156 L.

United States District Court, D. Rhode Island.

June 29, 1990.

Richard W. Petrocelli and Mark J. Hagopian, Visconti & Petrocelli, Ltd., Providence, R.I., for plaintiff.

Green Friedman and Packer, Robert D. Friedman, Alan M. Block, Boston, Mass., and C. Russell Bengston, Carroll, Kelly and Murphy, Providence, R.I., for defendants.

MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is presently before the Court on the motion of both defendants for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The instant action arises as a result of a discussion between representatives of plaintiff, Ralston Drywall Company, Inc. (Ralston), and defendant, United States Gypsum Company (USG), regarding the purchase of certain materials manufactured and sold by USG for use by Ralston in the performance of its work as a subcontractor on a construction project known as the Bryant Center. Prior to the submission of Ralston's bid on the project, an estimator employed by the company met with one or more employees of USG to determine 1) whether certain products manufactured by USG could be used by Ralston in its work on the Bryant Center and 2) if so, to ascertain an estimate of the cost of such materials. Plaintiff alleges that during this meeting USG recommended that Ralston bid the project based on a particular system of light gauge metal framing known as a "fly-by" system. Plaintiff further alleges that USG assured Ralston that this system would comply with project drawings and specifications. As a result of this discussion with USG, Ralston submitted its bid assuming that it could use the "fly-by" system and subsequently entered into a binding contract to perform certain work on the Bryant Center project. Ultimately, Ralston's design was rejected by the architect for the project because the "fly-by" system did not comply with the contract specifications. Ralston was then required to submit a second design proposal and perform additional work at the contract price.

In the case now before this Court, plaintiff asserts four theories for the recovery of damages against defendants. In Count I of the complaint, plaintiff alleges that USG breached an express warranty that the "fly-by" system would comply with project drawings and specifications. In Count II, plaintiff alleges breach of an implied warranty of fitness for a particular purpose. In Count III, plaintiff asserts that USG made false and fraudulent misrepresentations that the "fly-by" system would comply with project specifications. Finally, in Count IV, plaintiff alleges that Robert J. Clark, while acting within the scope of his duties as a technical sales representative for USG, was negligent in recommending the "fly-by" system to Ralston for use in its bid on the Bryant Center project.

Plaintiff's claims contained in Counts I, II and III of the complaint are asserted only against USG. The claims contained in Count IV are asserted against both defendants, USG and Clark.

The Court, after having heard arguments on the motion of both defendants for summary judgment on all counts, took the matter under advisement. The motion is now in order for decision.

BACKGROUND

The background in this case is as follows. On August 14, 1985, Ralston entered into a subcontract with H.V. Collins Company to perform certain work on the Bryant Center project located at Bryant College in North Smithfield, Rhode Island. The work to be performed by Ralston included the erection of a light gauge steel curtain wall and the subcontract required that Ralston perform all work in accordance with the plans and specifications prepared by the firm of Architectural Resources Cambridge, Inc. (ARC).

Prior to the submission of Ralston's bid on the project, J. Howard Johnson, an estimator employed by Ralston, met with one or more representatives of USG to discuss the purchase of certain products manufactured and sold by USG and to obtain an estimate of the cost of such products to assist Ralston in placing a dollar value on its bid. Richard Tierney, a technical sales representative for USG, attended this meeting on behalf of USG. Robert J. Clark, a structural engineer and also a technical sales representative for USG, was also

present.[1]

According to the deposition testimony of Johnson, it was during this meeting that Tierney assured him that USG's "fly-by" system of light gauge metal framing would comply with the plans and specifications for the Bryant Center project and recommended that Ralston submit its bid based on the use of this system. The "fly-by" system is characterized by the fact that it distributes wind and gravity loads to the perimeter spandrel beams rather than to the columns and requires that the studs be connected to these perimeter beams. In a "truss" system, on the other hand, the wind and gravity loads are supported by columns. The plans and specifications for the Bryant Center project were somewhat ambiguous in that they depicted a "fly-by" system in certain areas but the phrase "truss system" also appeared in the specifications. Johnson stated at his deposition that although he was familiar with the "fly-by" system, he had never heard of a "truss" system until he came across the phrase while reviewing the specifications for this particular project.

Prior to the time of the meeting between Johnson and Tierney, Clark had met with Robert Quigley, an architect employed by ARC, to discuss the load bearing requirements for the Bryant Center. At that time, Quigley informed Clark that the perimeter beams of the building in which the light gauge steel curtain wall was to be incorporated were not designed to be load bearing and that the columns were to bear the load of the framing system and the exterior veneer. Clark testified at his deposition that he had not come away from the meeting with Quigley knowing exactly how ARC wanted to build the project. He also stated, however, that although he does not recall whether he specifically mentioned that he had met with the architect on this project, he did notify both Tierney and Johnson that the intention of the plan for the Bryant Center was for the panels to be connected to the columns. Both Tierney and Johnson deny having had any knowl-

edge that the plans and specifications intended that the wall panels be connected to the columns. This dispute of fact, however, is not material to the outcome of the instant case.

Following his meeting with Tierney, Johnson telephoned in a bid to H.V. Collins. According to Johnson's deposition testimony, Ralston's bid was qualified in that it was based on Ralston using USG's "fly-by" system. Johnson also testified that he would generally qualify a bid if there was "a question in his mind" or to make "sure that there was no misunderstanding."

After receiving a letter of intent indicating that its bid was accepted, Ralston entered into a written contract with H.V. Collins for that part of the work for which Ralston had submitted a bid. This written contract did not include the qualification that the bid price (now contract price) concerning the erection of the light gauge steel curtain wall was based on the use of the "fly-by" system. Subsequent to the signing of the contract, Ralston submitted to H.V. Collins the technical information package that it had received from USG. H.V. Collins then submitted these materials to the architect for the Bryant Center project, ARC. On August 21, 1985, ARC notified Ralston that the design, as contained in the technical information package supplied by USG, did not meet project specifications for the construction of the light gauge steel curtain wall. The design was rejected because it required that wind and gravity loads be borne by the perimeter beams rather than the columns. The architect directed Ralston to submit a design consisting of a truss system, whereby a panelized frame would transfer wind and gravity load functions to the columns. Ralston then submitted a second design along with a request for extra compensation over and above its bid—contract price. ARC approved Ralston's second design but denied the request for extra compensation thereby requiring Ralston to perform the

---

**1.** Howard Johnson does not recall Clark being at this meeting but both Tierney and Clark testi-

fied that Clark was in attendance.

more expensive work at the bid—contract price.

Prior to commencing this action, Ralston attempted to recover its alleged extra costs by bringing a suit for damages against ARC. In that case, Ralston alleged that ARC was negligent in designing the Bryant Center, negligent in preparing the plans and specifications for the project and negligent in rejecting Ralston's design submittal. The suit was dismissed in late 1988.

## DISCUSSION

The law is well settled that summary judgment will only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). After a careful review of the facts and law relevant to the instant case, this Court concludes that there is no genuine issue as to any material fact and, furthermore, that defendants are entitled to judgment as a matter of law. The motion of defendants for summary judgment, therefore, is granted as to all counts.

## BREACH OF EXPRESS WARRANTY

■ In Count I of its complaint, Ralston asserts that USG is liable for breach of the express warranty that its "fly-by" system for light gauge metal framing would comply with the drawings and specifications for the Bryant Center project. The breach of warranty claim arises under Chapter two of the Uniform Commercial Code (Sales), as codified in R.I. Gen. Laws § 6A–2–313 (1985). In the case *sub judice*, it is undisputed that Ralston never in fact purchased any goods from USG. Thus, there being no sale nor any contract for sale between the parties, plaintiff's allegation of breach of warranty under § 6A–2–313 is misplaced.

As defined under the Uniform Commercial Code, a "seller" means "a person who sells or contracts to sell goods." R.I. Gen. Laws § 6A–2–103(1)(d). Plaintiff is correct in pointing out that under the Code definition, a "contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. R.I. Gen. Laws § 6A–2–106. In the instant case, however, the parties never entered into any contract at all. Ralston may have intended to purchase certain materials from USG if it was awarded the subcontract on the Bryant Center project, but no contract was ever formed. Therefore, since no contract for sale existed between the parties, there can be no claim for breach of warranty under the Uniform Commercial Code.

■ In any event, there was no express warranty, as that phrase is defined in the Code, running from USG to Ralston in this case. An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain...." R.I. Gen. Laws § 6A–2–313(1)(a). "[A] statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." R.I. Gen. Laws § 6A–2–313(2). In addition, Rhode Island law requires that in order to establish breach of an express warranty, the plaintiff has the burden of proving that the statements or representations made by the seller induced plaintiff to purchase the product and that he/she *relied* upon such statements or representations. *Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I.1985) (emphasis added); *Rogers v. Zielinski*, 99 R.I. 599, 602, 209 A.2d 706, 708 (1965). After a careful review of the undisputed facts in the instant case, this Court concludes 1) that the statements allegedly made by USG were in the form of an opinion and thus did not give rise to an express warranty under the Code and 2) that plaintiff did not rely on the statements purportedly made by the "seller".

Tierney testified by deposition that when he met with Johnson, he assured him that USG's "fly-by" system would meet the specifications for the Bryant Center Project.[2] Johnson also stated that Tierney told him that the "fly-by" system would

2. The deposition of Richard Tierney was taken on September 1, 1988 in relation to plaintiff's prior lawsuit against Architectural Resources Cambridge, Inc.

satisfy the specifications. Plaintiff contends that this assurance by Tierney constituted an affirmation of fact which created an express warranty under the Uniform Commercial Code. Johnson's own testimony indicates, however, that he contacted Tierney in order to receive "advice" and "guidance" in the form of an opinion from USG as to how to proceed in formulating a bid on the Bryant Center project. Thus, even if Tierney did state that the "fly-by" system would meet the specifications, his assertions were clearly an expression of his opinion as to how Ralston should bid the project. The statements of Tierney, therefore, cannot form the basis for an express warranty under Rhode Island law.

■ In addition, the Court finds that the breach of warranty claim must fail because plaintiff did not rely on the statements allegedly made by USG. Ralston asserts that it was relying on the representation made by USG that the "fly-by" system would comply with project specifications when it submitted its bid to H.V. Collins based on the use of that system. Johnson admitted at his deposition, however, that he submitted a "qualified" bid on the project because there was a question in his mind as to the suitability of the "fly-by" system. More specifically, Johnson testified as follows:

Q. I know that's a term in the industry, could you describe what it means to qualify a bid?

A. Yes, in particular on this job, our bid was qualified in that we were basing our bid on U.S.G.'s Fly By System.

Q. Now in general, under what circumstances would you qualify a bid?

A. More of a clarification than anything else. If there is a question in your mind, or to make sure that they fully understand what you're bidding on, you will clarify it so that they understand.

Q. And is the purpose of clarifying, qualifying your bid is to protect your company from having to do work at a cost that you didn't anticipate?

A. Yes. Yes, also to help them so that it's easy, yes.

Q. You mentioned that you did qualify the bid in this case?

A. Yes.

Q. Do you recall what you said to Mr. Hatfield?

A. I think basically that was it, our bid was based on U.S.G.'s Fly By System.

Q. Do you recall what, if anything, he responded to that?

A. No, I think it was just a simple "okay".

Q. Just to be clear on this, why in this case did you feel it necessary to tell him about, to qualify the bid in that way?

A. Well, because of that business about the truss in the spec and seeking the opinion of Mr. Tierney and going on that, I just wanted to make sure that there was no misunderstanding.

Johnson's deposition testimony makes clear that Ralston was well aware that there was some question as to whether the "fly-by" system would comply with the architect's requirements for the erection of the steel frame wall on the Bryant Center project. Johnson admits that he explicitly qualified Ralston's bid to make sure that H.V. Collins understood that the cost estimate was based on the use of the "fly-by" system. Clearly if Johnson was uncertain as to whether the system would be acceptable to the architect on the project, he was not relying on any representation by USG when he submitted Ralston's bid.

Plaintiff argues that by informing H.V. Collins that it was bidding the project based on the "fly-by" system, Ralston was only making a "point of clarification" and was not conditioning its bid on acceptance of that system. In support of this contention, Ralston relies on the deposition of Johnson taken in the case of *Ralston v. A.R.C.* rather than looking to his more recent testimony. After reviewing the brief excerpt submitted by Ralston from Johnson's earlier deposition, the Court finds that the substance of both statements is essentially the same. Thus, there being no material issue of fact in dispute, the Court rejects plaintiff's interpretation as to the significance of Johnson's qualification of Ralston's bid.

Ralston's big mistake here was in not incorporating the oral qualification into the written contract with H.V. Collins, but that really has no bearing on the outcome of the case. The crucial fact is that when Johnson phoned in Ralston's initial bid, he had enough doubts about the suitability of the "fly-by" system to qualify his bid accordingly. Thus, although Johnson may have trusted Tierney's opinion that the "fly-by" system would meet the project specifications, he did not rely on that recommendation in submitting Ralston's bid on the project. For these reasons, defendant USG is entitled to judgment as a matter of law with respect to Count I of the complaint alleging breach of express warranty under § 6A–2–313 of the U.C.C.

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

In Count II of its complaint, plaintiff alleges that USG is liable to Ralston for breach of an implied warranty of fitness for a particular purpose. More specifically, plaintiff asserts that USG warranted to Ralston that its "fly-by" system was fit for the purpose of constructing a light gauge steel curtain wall in compliance with the requirements of project drawings and specifications for the Bryant Center.

An implied warranty of fitness for a particular purpose arises under Rhode Island law "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods,...." R.I. Gen. Laws § 6A–2–315. As stated above, there was no sale nor any contract for sale in the instant case. Thus, as was the case with the allegation of breach of an express warranty, there is simply no transaction to which an implied warranty could attach.

Furthermore, the Rhode Island Supreme Court has upheld the determination by a

trial justice that in considering an allegation of breach of an implied warranty of fitness, the burden is on plaintiff to prove that she relied on the defendant's skill and judgment. *Rogers v. Zielinski*, 99 R.I. at 602, 209 A.2d at 708.[3] In the case *sub judice*, this Court has previously determined that plaintiff has failed to establish that it relied on the alleged representations made by USG with respect to the allegation of breach of an express warranty. The same holds true with regard to plaintiff's allegation of breach of an implied warranty of fitness for a particular purpose. Although USG may have had superior knowledge regarding the appropriateness of the "fly-by" system for use on this particular job, the evidence is clear that in submitting a qualified bid on the project, Johnson did not rely on the recommendation of defendant. Defendant USG is therefore entitled to summary judgment on this issue as a matter of law.

## FRAUD AND MISREPRESENTATION

■ In Count III of its complaint, plaintiff alleges that USG is liable to pay damages for making a knowingly false representation to Ralston that the "fly-by" system would comply with the drawings and specifications for the Bryant Center. The Rhode Island Supreme Court has made very clear that one can only be liable for damages for fraud where he intentionally misrepresents a material fact. *Halpert v. Rosenthal*, 107 R.I. 406, 412, 267 A.2d 730, 733 (1970). Thus, in order to recover in an action in tort for deceit, a plaintiff must show that the defendant knowingly made a false statement with the intent to deceive, thereby inducing the other party to rely on such statement to his detriment. *Katz v. Prete*, 459 A.2d 81, 84 (R.I.1983); *Halpert, supra.* Under Rhode Island law, it is fundamental in such an action that a plaintiff present evidence which shows that he was induced to act because of his reliance upon the alleged false representation. *East*

3. In this case, the court was interpreting the prior Rhode Island law which provided in pertinent part that:

Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

R.I. Gen. Laws § 6–3–15(1) (1956).

*Providence Loan Company v. Ernest,* 103 R.I. 259, 263, 236 A.2d 639, 642 (1968).

Plaintiff contends that since the architect for the Bryant Center project had informed Robert Clark, prior to his meeting with Tierney and Johnson, that the perimeter beams for this particular project were not designed to be load bearing, Clark knew that the "fly-by" system would not comply with project specifications and failed to disclose this fact to Tierney or Johnson.[4] Clark stated at his deposition that although he did not come away from his meeting with the architect knowing exactly how ARC wanted to build this particular project, he notified both Tierney and Johnson that his understanding of the architect's intention was that the columns would bear the wind and gravity loads rather than the perimeter beams. Both Tierney and Johnson deny that Clark ever provided them with this information. However, even if this Court assumes that Clark intentionally concealed his knowledge as to the load bearing requirements for the Bryant Center, the fact that Ralston submitted a qualified bid on the project negates any assertion that it relied on the alleged false representation. Defendant USG is therefore entitled to summary judgment with respect to this claim.

### NEGLIGENCE

In Count IV of its complaint, plaintiff alleges that defendant Clark, while acting within the scope of his duties as a technical sales representative for USG, "failed to use the care of a reasonably prudent structural engineer when recommending U.S.G.'s so called 'fly-by' system to Ralston for use in its bid on the [Bryant Center] [P]roject." On that basis, plaintiff asserts that it suffered damages "[a]s a direct and proximate result of the negligence of Robert J. Clark and U.S.G." Although not stated explicitly in the pleadings, the facts of this case make clear that the charge of negligence in Count IV of Ralston's complaint is, in essence, an allegation of negligent misrepresentation against Clark and USG. The Court, therefore, will treat it accordingly.

In order to support a claim for negligent misrepresentation under Rhode Island law, Ralston must establish that it relied on the alleged misrepresentation made by defendant. *Halpert v. Rosenthal,* 107 R.I. 406, 415, 267 A.2d 730, 735 (1970) (A misrepresentation, even though innocently made, may be actionable, if made and relied on as a positive statement of fact). *See also Dowling v. Narragansett Capital,* 735 F.Supp. 1105 (D.R.I.1990). This Court has already determined that there was no reliance in the instant case. In addition, when there is reliance on a negligent misrepresentation, the only remedy is rescission of the contract entered into as a result. *Halpert v. Rosenthal, supra.* Here there was no contract between Ralston and USG so the doctrine of negligent misrepresentation clearly has no application.

Defendants argue in their memorandum in support of the motion for summary judgment that they could not be held liable to Ralston for negligence in any event because there was no duty of due care running from USG and/or Clark to plaintiff. That point is debatable. The general rule set forth in the Restatement (Second) of Torts states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) *is limited to loss suffered*
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

---

**4.** It is interesting to note that, according to the deposition testimony of Johnson, he does not recall Clark being present at the meeting with Tierney. It is therefore difficult to understand how plaintiff can base its allegations of fraud on statements allegedly made (or not made) by Clark at this meeting.

(b) *through reliance upon it* in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1977) (emphasis added).

Assuming that Clark and USG owed plaintiff a duty to exercise reasonable care in obtaining or communicating information about the "fly-by" system in the circumstances of this case, the defendants cannot be held liable under Count IV. Since Ralston made a qualified bid, it clearly did not rely on the allegedly false information supplied by Clark and USG. Under the circumstances which are undisputed in this case, plaintiff has no cause of action for negligent communication of information and summary judgment must be entered for defendants.

### CONCLUSION

For all the foregoing reasons, the motion of defendant USG for summary judgment with respect to Counts I, II and III of the complaint is granted. The motion for summary judgment of both defendants on Count IV of the complaint is also granted.

### EPILOGUE

What shines through in this case is that Ralston created its own difficulties. It could have incorporated the oral qualification of the bid into the written contract with H.V. Collins, or it could have refrained from signing the subcontract until it received approval from the architect of use of the "fly-by" system. Johnson admitted at his deposition that the normal practice in the industry is that when a bid is qualified, if that bid is accepted, the qualification is written into the contract. It was Ralston's decision to ignore this accepted practice and to sign the contract without the architect's approval which caused it to do work that was more costly under the subcontract. Ralston, therefore, must accept those consequences.

*It is so Ordered.*